108 P.3d 173 (2005)
126 Wash.App. 235
STATE of Washington, Respondent,
v.
William Bernard BLANCHFIELD, Appellant.
No. 30553-4-II.
Court of Appeals of Washington, Division 2.
March 8, 2005.
*174 Kathryn A. Russell Selk, Attorney at Law, Seattle, WA, for Appellant.
Donna Yumiko Masumoto, Attorney at Law, Tacoma, WA, for Respondent.

PART PUBLISHED OPINION
ARMSTRONG, J.
¶ 1 After a jury convicted William Blanchfield of fourth degree domestic violence assault, the superior court ordered that Blanchfield pay restitution to the victim of his assault. He appeals, arguing that the trial court erred in ordering restitution, that the State's witnesses gave improper opinion testimony, and that his counsel was ineffective for failing to object to that testimony. Holding that the trial court erred in ordering restitution for some of the victim's claimed damages but that the State's witnesses did not give improper testimony and Blanchfield's counsel was not ineffective, we affirm Blanchfield's conviction but vacate part of the restitution order.

FACTS
¶ 2 On August 13, 2002, a domestic argument between Blanchfield and Laura Aymond turned violent. Because of the argument, Aymond planned to go to a motel but could not find her purse, which contained her keys, driver's license, and credit cards. She believed that Blanchfield had hidden her purse, although he denied it. Aymond spent a couple of hours looking for her purse. Finally, she grew frustrated, screamed "I just want my F'ing purse," ran toward Blanchfield and grabbed his arms or shoulders. 2 Report of Proceedings (RP) at 99. She claimed that Blanchfield pushed or shoved her back, causing her to fall and hit her head on an end table.[1] After she got up, Blanchfield pushed her again, causing her head to hit the wall and a picture to fall from the wall onto her shoulder. She said she picked up the picture, threw it at Blanchfield, and ran into the bedroom.
¶ 3 About one-half hour later, Aymond heard the telephone ring. After he answered the call, Blanchfield told Aymond that his son had been injured at work and that he had to attend to him. After Blanchfield left, Aymond found her purse in the back of a closet where Blanchfield had told her not to look. When she tried to leave, she found that the door of her car was damaged and that the car would not start. Blanchfield returned home and denied having done anything to her car.
¶ 4 The next day, Aymond went to a hotel, where she stayed for the next three nights. *175 She made arrangements with movers to remove her belongings from Blanchfield's house. On August 15, she returned to Blanchfield's house to pack her belongings. She and her son returned to Blanchfield's house on August 16 to finish packing her belongings. During this visit, Aymond claimed that Blanchfield began yelling to "get the [f* * *] out." 2 RP at 118. She and her son left, and she went to the police.
¶ 5 When Aymond went to the police on August 16, she had a black eye, an injury to her right foot, and pain in her lower back and left shoulder. She sought medical attention for those injuries on August 17. Deputy Eugene Abuan interviewed Aymond and took photographs of her eye, left arm, and right foot. He then talked to Blanchfield, who did not want to answer his questions. Deputy Kevin Johnson later conducted a follow-up investigation, including interviewing Aymond, taking additional photographs, and obtaining her medical records.
¶ 6 The State charged Blanchfield with second degree assault  domestic violence and with first degree malicious mischief  domestic violence. Aymond and the deputies testified as described above.
¶ 7 Blanchfield's son testified to prior arguments between Aymond and Blanchfield. He also testified that later in the evening of August 13, Aymond returned to Blanchfield's house. Aymond was intoxicated, swore at Blanchfield, turned over a table, grabbed Blanchfield's hair, and tried to grab a steak knife. Blanchfield testified that he had disabled Aymond's car, by detaching the coil wire, to prevent her from driving while intoxicated, but he denied damaging the car.
¶ 8 Blanchfield testified that during the argument on August 13, Aymond had taken the picture from the wall, hit him in the head with it, lunged at him, and grabbed his neck and shoulders. He jerked away from her, causing her to trip over the end table. He did not believe she had been injured when she fell. He asserted that he had hidden her purse to prevent her from driving while intoxicated. He also testified that Aymond had returned to his house later that night, started to argue with him again, turned over a table, wrestled with him, and tried to grab a steak knife. He denied that Deputy Abuan asked him any questions on August 16. He testified that the deputies had simply arrested him.
¶ 9 At Blanchfield's request, the court instructed the jury on self-defense and the lesser included crime of fourth degree domestic violence assault. The jury acquitted Blanchfield of second degree assault and of first degree malicious mischief but convicted him of fourth degree domestic violence assault.
¶ 10 At a subsequent restitution hearing, the State sought restitution as follows:

1. Restitution to Aymond for:
a. Co-payments for medical treatments $ 220.00
b. Hotel expenses for three nights $ 153.63
c. Bill from moving company, who Blanchfield prevented $ 258.00
 from moving Aymond's belongings
d. Belongings that Blanchfield had not returned, including:
i. Snow tires $ 400.00
ii. Riding lawn mower $ 500.00
iii. Weight bench and weights $ 100.00
iv. Outdoor table and chairs $ 50.00
v. Framed paintings and posters $ 200.00
vi. Automatic dog feeders $ 50.00
vii. Suitcase $ 80.00
 _________
Subtotal $1,380.00
 _________
Total $2,011.63
 _________
 _________
2. Restitution to Crime Victims Compensation Program for claims paid
 for Aymond's medical treatments $1,951.90.

Restitution Exhibits 1 through 5.
¶ 11 As to restitution to Aymond, Blanchfield disputed the connection of the hotel bill, *176 moving company bill, and Aymond's unreturned belongings to the assault. He also disputed the values Aymond gave for the snow tires, the weight bench and weights, the outdoor table and chairs, and the suitcase. As to restitution to the Crime Victims Compensation (CVC) Program, Blanchfield objected to the lack of details as to the services the program paid for. The court ordered restitution in the amounts the State requested. Blanchfield timely appealed his conviction and the restitution order.

ANALYSIS

1. Restitution Order

¶ 12 When restitution is authorized by statute, an award of restitution falls within the discretion of the trial court and we will not disturb the award of restitution absent an abuse of discretion. State v. Enstone, 137 Wash.2d 675, 679, 974 P.2d 828 (1999); State v. Davison, 116 Wash.2d 917, 919, 809 P.2d 1374 (1991). Under former RCW 9.94A.753(5) (2002), restitution "shall be ordered whenever the offender is convicted of an offense which results in injury to any person or damage to or loss of property." The amount of restitution must be based on "easily ascertainable damages for injury to or loss of property, actual expenses incurred for treatment to persons, and lost wages resulting from injury." Former RCW 9.94A.753(3).
¶ 13 Blanchfield argues first that the hotel bill, the moving company bill, and the value of Aymond's unreturned belongings were not causally connected to the assault for which he was convicted and, thus, should not have been part of the restitution order. "`A restitution order must be based on the existence of a causal relationship between the crime charged and proven and the victim's damages.'" State v. Woods, 90 Wash.App. 904, 907, 953 P.2d 834 (1998) (quoting State v. Blair, 56 Wash.App. 209, 214-15, 783 P.2d 102 (1989)). The State responds that but for Blanchfield's assault, and her subsequent fear of further violence from Blanchfield, Aymond would not have needed to stay in the hotel or employ movers and would have been able to retrieve all of her belongings from Blanchfield's house.
¶ 14 We agree with Blanchfield. In Woods, this court reversed a restitution order against a person convicted of possessing a stolen truck for belongings that had been in the truck when it was stolen. We held, "it cannot be said that `but for' Woods's possession of the stolen vehicle in September, the owner would not have lost the personal property located in the vehicle when it was stolen in August." Woods, 90 Wash.App. at 909-10, 953 P.2d 834. Here, Aymond had already planned to go to a hotel after her argument with Blanchfield began, and she did not go to the hotel until the next night, so her hotel stay was not causally connected to the assault. Nor did Aymond show that but for Blanchfield's assault, she would not have incurred the moving company expenses. Her decision to move was not causally connected to Blanchfield's assault, so her moving expenses could not be part of the restitution arising from the assault. Similarly, the loss of Aymond's belongings was not causally connected to Blanchfield's assault, so the value of those belongings could not be part of the restitution arising from the assault. Without the required causal connection, the trial court lacked the statutory authority to award restitution for those expenses and losses. Therefore, we vacate those expenses and losses from the restitution order.
¶ 15 Blanchfield argues next[2] that Aymond's statement as to her medical expenses and the report from the CVC Program were insufficient to show that those expenses were causally connected to the assault. He relies on State v. Hahn, 100 Wash.App. 391, 399-400, 996 P.2d 1125 (2000), and State v. Bunner, 86 Wash.App. 158, 160, 936 P.2d 419 (1997), which held that a Department of Social and Health Services (DSHS) summary report of medical expenses was insufficient. In Hahn and Bunner, the court *177 had only the DSHS summary report of medical expenses. Hahn, 100 Wash.App. at 399-400, 996 P.2d 1125; Bunner, 86 Wash.App. at 159-60, 936 P.2d 419. Here, Aymond testified that the payments to St. Peter's Hospital and William Hurley arose from her emergency room visit on August 17, that the payment to South Sound Radiologists was for reading x-rays taken during that visit, that the payments to L.A. Agatrap were for orthopedic follow-ups for injuries caused by Blanchfield's assault, and that the payments to William Hinson were for physical therapy for injuries caused by Blanchfield's assault. The court did not abuse its discretion in basing the amount of restitution for medical expenses on Aymond's statement, the CVC report, and Aymond's testimony.
¶ 16 We vacate the restitution order as to its award of the hotel bill, the moving company bill and the value of Aymond's belongings. We affirm the restitution order as to its award of medical co-payments Aymond paid and medical expenses the CVC program paid.
¶ 17 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.
We concur: HOUGHTON, P.J., and BRIDGEWATER, J.
NOTES
[1] Blanchfield is 9 inches taller and 35 pounds heavier than Aymond.
[2] Blanchfield also argued that Aymond's testimony as to the value of her unreturned belongings was not sufficient to establish the value of those belongings. Given our holding that the loss of those belongings is not a proper part of the restitution order, we need not address the issue of how those belongings were valued.